Robert W. Ottinger (SBN 156825)
robert@ottingerlaw.com
Melanie L. Proctor (SBN 228971)
melanie@ottingerlaw.com
THE OTTINGER FIRM, P.C.
2108 N Street, Suite N
Sacramento, CA 95816
Tel: 415-262-0096
Fax: 212-571-0505

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT GRUENDEL, an individual<br><br>Plaintiff,<br><br>vs.<br><br>FIGURE AI, a Delaware Corporation<br><br>Defendant. | **CASE NO.:** 5:25-cv-10094<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES**<br><br>1. **RETALIATION (Cal. Lab. Code § 1102.5)**<br>2. **RETALIATION (Cal. Lab. Code § 98.6)**<br>3. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff Robert Gruendel complains and alleges as follows:

## INTRODUCTION

1. This whistleblower retaliation action arises from the unlawful termination of a robot safety engineer whose safety warnings presented an obstacle to Defendant Figure AI, Inc. ("Defendant" or "Figure")'s efforts to rush a potentially dangerous humanoid robot to market. Plaintiff Robert Gruendel, a highly credentialed robot safety engineer, was recruited by Figure, a robotics company developing general-purpose humanoid robots for use in the home and workplace, to lead its product safety program. As Head of Product Safety, Plaintiff's mandate was simple: keep workers and future customers safe. He did exactly that. Plaintiff consistently raised safety concerns, received strong performance feedback, and was even awarded a raise less than a year into his tenure.

2. Unfortunately, Plaintiff's commitment to safety, and to protecting Figure's personnel and future customers, clashed with Figure's self-declared Core Values to "Move Fast & Be Technically Fearless," maintain "aggressive optimism," and "bring a commercially viable humanoid to market." When he warned Figure's CEO, Brett Adcock, and Chief Engineer, Kyle Edelberg, that Figure's humanoid robots were powerful enough to fracture a human skull and had already carved a ¼-inch gash into a steel refrigerator door during a malfunction, his concerns were treated as obstacles, not obligations.

3. As Head of Product Safety, Plaintiff and his department had the authority to halt the release of an unsafe product—authority Figure viewed as incompatible with its speed-at-all-costs approach. Just days after his most direct and documented safety complaints in August 2025, Figure abruptly terminated Plaintiff on September 2, 2025, offering only a vague "change in business direction" as the pretext.

4. Figure's actions violated California's strong public policy protecting employees who disclose or oppose violations of law relating to workplace safety and compliance, as codified in California Labor Code §§ 1102.5 and 98.6, and recognized in the common law tort of wrongful termination in violation of public policy.

///

///

**PARTIES**

5. Plaintiff is an individual who was at all times relevant to this action, until his wrongful termination, an employee of Defendant.

6. While employed by Defendant, Plaintiff performed over fifty percent of his work in California, including regular on-site work at Figure's headquarters, and spent the remainder of his time in Sammamish, Washington working remotely or traveling elsewhere on business for Figure. Plaintiff worked for Figure as Head of Product Safety. Plaintiff is a seasoned robot safety engineer with over two decades of experience in robotics, human-robot interaction, and compliance with domestic and international safety standards.

7. Defendant is a Delaware corporation with its principal place of business in Santa Clara County, California, and at all relevant times met the definition of "employer" under applicable statutes, laws, and regulations.

8. Defendant is a robotics company developing general-purpose humanoid robots designed to perform tasks in various industries like manufacturing, logistics, and retail, and potentially in consumer and home settings. These robots use Artificial Intelligence ("AI") to learn, think, and interact with their environment, aiming to assist humans with dangerous or undesirable jobs and address labor shortages.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

10. The Court also has diversity jurisdiction under 28 U.S.C. § 1332 because complete diversity of citizenship exists and the amount in controversy meets the minimum threshold. Plaintiff resides in Sammamish, Washington and Defendant is a corporation headquartered in California. The amount in controversy exceeds $75,000.

11. The Court has general personal jurisdiction because Defendant's principal place of business is San Jose, California.

12. Venue is proper in the Northern District of California under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred within this District, and because Defendant resides in this District and is subject to personal jurisdiction here. The

acts and practices alleged in this Complaint were carried out, in whole or in part, in this District.

**DIVISIONAL ASSIGNMENT**

13. The events giving rise to this complaint occurred, in part, in Santa Clara County, California. Accordingly, pursuant to Rule 3-5(b) of the Civil Local Rules, this case should be assigned to the San Jose Division.

**STATEMENT OF FACTS**

14. Plaintiff began his employment with Defendant on October 7, 2024, following recruitment efforts beginning in August 2024 and a "soft start" on September 15, 2024.

15. Plaintiff was hired as Principal Robotic Safety Engineer and reported directly to Figure's Chief Executive Officer, Brett Adcock ("Adcock").

16. Plaintiff was told he would be responsible for developing and enforcing Figure's global safety strategy and assured during his interviews prior to joining Figure that safety was a "top priority."

17. During his first week of employment and while working on-site in California, Plaintiff observed that Figure had no formal safety procedures, incident-reporting systems, or risk-assessment processes for the robots under development and noted that Figure had no dedicated Employee Health and Safety ("EHS") staff, only a contractor with unrelated semiconductor experience.

18. Plaintiff raised these concerns to the Vice President of Commercial, Dana Berlin ("Berlin"), and subsequently developed a product safety roadmap approved by Adcock and Chief Engineer, Kyle Edelberg ("Edelberg") while working on-site at Figure in California.

19. Also during his first week, Plaintiff met with key team members and sat in on an all-hands design review of Figure's new robot model, Figure 03 ("F.03"). As part of the effort of bringing F.03 to market, Plaintiff developed a safety roadmap that was approved by Adcock and Edelberg and the product safety requirements specified therein were added to the F.03 product specification.

20. Adcock and Edelberg expressed a dislike of written product requirements, which Plaintiff responded to by indicating that their stance was abnormal in the field of machinery safety and of concern to him as Head of Product Safety. This interaction took place while Plaintiff was on-site in California.

///

21. As part of his duties, Plaintiff observed employees working with Figure's robots and identified a need for employee safety training to reduce the risk of harm to employees from the robots.

22. Helix AI is Figure's AI system that powers the humanoid robots.

23. AI has many risks traditional machine control does not, including hallucinations, unexplainable decisions, self-preservation, and apparent consciousness.

24. While working on-site in California, Plaintiff emphasized to Berlin that providing a safe workplace was a legal requirement and recommended several risk reduction measures.

25. Several of the risk reduction measures proposed by Plaintiff were not approved, because, as Berlin noted, "[Adcock] would shoot us if we did it."

26. This sort of reaction to Plaintiff's safety recommendations was common, as many executives took the view that safety measures could detract from investor-presentable robots.

27. In late 2024, Plaintiff completed a formal product safety roadmap identifying safety features by robot generation (F.02, F.03, F.04, etc.) and established the development of onboard safety presence sensing as a top five priority for ensuring home safety.

28. In mid-December 2024, after Plaintiff and Adcock discussed typical product safety organizational structures, Adcock agreed with Plaintiff's suggestions to ensure independence of Plaintiff's team and the product safety team was established as one of the key stakeholders with the power to prevent an unsafe product from being released.

29. In January 2025, Adcock asked Plaintiff what it would take to put Figure robots in the home.

30. In response, Plaintiff immediately began building a home safety roadmap identifying the relevant safety standards, critical legal risks, and regulatory requirements.

31. The home safety roadmap was published internally and Plaintiff briefed Edelberg on it in person in California. Adcock declined to attend the briefing.

32. Believing that it was critical for the CEO and safety team to be aligned, Plaintiff sent Adcock a condensed version of the requirements for his review. Adcock never responded.

///

///

33. In early March 2025, while on-site in California, Plaintiff met with Figure's Commercial team to review the home safety requirements and ensure that they were aware of the risks and risk reduction measures associated with putting Figure robots in the home.

34. Plaintiff recognized that erecting guarded areas in a home to ensure that the robots would not endanger their surroundings would be impractical. Therefore, solving the challenge of detection of objects, classifying the objects as living things, and stopping or slowing movement to prevent injury was identified by Plaintiff as a key initiative for bringing Figure robots to the home market.

35. In mid-May 2025, Plaintiff met with Home Data Collection Lead, Misako Sasayama ("Sasayama"), to discuss what must be done to ensure the safety of people while training AI models in the home. Plaintiff explained that completing a risk assessment based on the known tasks and environment was critical to proving employee safety due diligence.

36. Adcock named Plaintiff, Edelberg, Sasayama, and Head of Facilities, Kirk Borovick, as the critical stakeholders in charge of approving the residual risk and mitigation measures for the initial risk assessment, and the initial risk assessment based on initial impact data was completed in late June 2025.

37. In May and June 2025, Plaintiff presented a detailed safety strategy to two of Figure's investors, one of which asked Plaintiff to debrief it on Figure's safety roadmap across robot generations.

38. In response, Plaintiff created a whitepaper that was well received by the investor and praised publicly by Adcock.

39. The second investor asked Plaintiff for a thirty-minute debrief/Q&A on Figure's product safety roadmap.

40. In his deliverable to both investors, Plaintiff presented what he believed to be an unchangeable plan, but only months later the plan was significantly downgraded by Edelberg.

41. In response to this downgrade, Plaintiff sent an email to Edelberg pointing out that the investors were presented with a product safety plan which contributed to their decision to invest but was then gutted the same month Figure ended the investment round, flagging that this could be

interpreted as fraudulent.

42. On July 28, 2025, impact testing of F.02 was conducted with multiple hits and the lead engineer programmed the robot to hit at its strongest capacity.

43. During the impact test, F.02 moved at super-human speed and the impact meter measured forces that were twenty times higher than the threshold of pain. Threshold of pain limits come from ISO 15066, a technical specification that provides safety requirements for collaborative industrial robot systems where humans and robots share a workspace.

44. Plaintiff estimated the force generated by F.02 to be approximately more than twice the force necessary to fracture an adult human skull.

45. On July 29, 2025, Vice President of Growth, Lee Randaccio ("Randaccio"), contacted Plaintiff to inform him that he was given a $10,000, or 5.2%, raise and told Plaintiff that "[i]t's been great to see your continued growth and impact at Figure. You've been doing an excellent job, and we want to recognize the consistent effort, positive mindset, and value you bring to the team."

46. On July 30, 2025, after processing the data from the F.02 impact test, while on-site in California, Plaintiff sent a Slack communication to Adcock informing him that the robot was capable of inflicting severe permanent injury on humans. Plaintiff's message was ignored.

47. The same day or shortly after, Plaintiff sent a Slack communication to Edelberg to inform him of these concerns and to indicate that Figure needed to take immediate action to distance personnel from the robots.

48. The new EHS lead, Mallikarjun Mudagall ("Mudagall"), was informed of this information and the need to act.

49. Mudagall arranged a meeting with Plaintiff and Edelberg to discuss risk reduction options.

50. Plaintiff informed Mudagall that a week before Mudagall's start, Plaintiff had created an anonymous employee safety suggestion survey and a separate, non-anonymous, near-miss and injury reporting tool.

51. Because there had been no EHS on site, Figure employees had begun expressing their safety concerns directly to Plaintiff. As a result of these conversations, it became evident to Plaintiff

COMPLAINT 7

that there were many near misses occurring, but not being tracked.

52. This conclusion was further evidenced by an instance where an employee was standing next to an F.02 and the F.02 malfunctioned and punched a refrigerator, narrowly missing the employee. The robot left a ¼-inch deep gash in the refrigerator's stainless-steel door.

53. Based on the new impact data, the home data collection risk assessment for Figure employees needed to be updated with additional risk reduction measures.

54. The revised risk assessment measures included training, separation of personnel using stanchions or safety mats to indicate where personnel were permitted to stand, and a constant safety observer with control of an emergency stop ("E-Stop").

55. During a weekly meeting with Edelberg while on-site in California, Plaintiff explained some of the risks that Figure faced, including robots being used in the home and Figure being exposed to liability if its product caused injury to customers. Plaintiff revisited the home safety roadmap, which included the estimated long development times for some of the necessary safety features.

56. Edelberg stated that he was not confident that what Plaintiff explained was true and tasked Plaintiff with finding outside consumer product safety legal counsel to provide their opinion.

57. Plaintiff obliged the request to find outside counsel and conducted interviews beginning in mid-July through his last week of employment.

58. In August 2025, Plaintiff's internal safety advocacy intensified, and after Plaintiff's repeated warnings, management's attitude shifted sharply.

59. On or about August 11, 2025, Plaintiff was informed that Edelberg was ending a project to certify an E-Stop function. The process of certification proves that the E-stop, a critical risk reduction measure when a robot is run by a safety observer, is sufficiently reliable to prevent risk to personnel. Edelberg's decision marked a foundational shift in safety, as investors had been sold on the E-Stop. Plaintiff, along with the risk approving stakeholders, documented the need for a reliable E-Stop and that it was a minimal safety feature upon which the safety risk estimation was based.

60. On August 14, 2025, while on-site in California, Plaintiff sent an email to Edelberg, copying the Commercial and Legal teams, summarizing the ongoing need to prove the E-Stop was meeting the reliability required to keep Figure employees safe.

61. Two employees within the Commercial Department who had received the email approached Plaintiff and expressed alarm that he had put his concerns in writing in an email.

62. On August 15, 2025, Plaintiff sent a Slack message to Edelberg to follow up on the email and asked Adcock if he had any questions about the email. Plaintiff reiterated that the current E-Stop was not sufficient with respect to employee safety.

63. Plaintiff was informed the following week that a safety feature of F.02 had been removed without his knowledge because the principal engineer did not like the aesthetic appearance of the safety feature.

64. That week, while on-site in California, Plaintiff asked Adcock via Slack if Adcock expected safety changes to be approved by Plaintiff. Adcock responded that he did not know what Plaintiff was referring to and was too busy to get involved.

65. Plaintiff met with the principal engineer and reached a compromise regarding the removed safety feature, but the dismissal of safety concerns was apparent.

66. During the week of August 25, 2025, Plaintiff and a colleague in Figure's Legal Department decided to move to the next interview round with a large law firm as outside consumer product safety counsel. Adcock and Edelberg asked to participate in the interview.

67. On August 26, 2025, when Plaintiff learned that Adcock was in support of partnering with the outside counsel, he wrote to Adcock that learning this was "the highlight of my week" and went on to say that Figure had been in a phase of safety demotion and provided multiple datapoints to speak to this. Plaintiff was in California when he sent this message.

68. On August 31, 2025, Adcock responded to Plaintiff's message and denied that Figure was in a phase of safety demotion.

69. Plaintiff responded to Adcock that day with several examples and reiterated that he was glad they were discussing safety, nevertheless.

70. During his tenue, as Plaintiff continued to voice his concerns, Adcock had slowly disengaged in safety discussions by decreasing their weekly meetings to bi-weekly, then monthly, then quarterly meetings and eventually stopped replying altogether to many of Plaintiff's messages.

///

71. On August 27, 2025, Plaintiff wrote an email to Head of Helix AI, Corey Lynch, summarizing an in-person meeting during which Plaintiff showed him examples of unsafe robot behaviors, including a photograph of a robot within two feet of kicking a person in the head.

72. On August 29, 2025, Plaintiff co-led a robot teleoperator safety training emphasizing the high risks to employees.

73. On September 2, 2025, just four days after emphasizing the robots' high risks to employees during a safety training meeting and only weeks after his most detailed written complaint about certification cancellations and danger the robots posed to employees and customers, Plaintiff was summoned to a surprise meeting with Randaccio and informed that his employment was terminated immediately due to a "change in business direction" related to Figure's targeting of the home market.

74. The stated reason was pretextual. Plaintiff had been praised and rewarded mere weeks earlier, and the alleged "change in direction" was directly related to the very safety initiatives he had been leading and for which he had developed solutions.

75. Immediately before his termination, Plaintiff had finalized documentation showing that Figure's humanoid robot generated forces up to twenty times the human pain threshold, posing extreme risk to humans.

76. Plaintiff's disclosures throughout his tenure were made in good faith and with a reasonable belief that Figure's practices violated law and endangered employees and the public.

77. Rather than address the issues raised by Plaintiff, Figure executives consistently minimized the concerns, emphasizing rapid development timelines and investor demonstrations over compliance and safety.

78. No other senior leaders in comparable roles were terminated.

79. The close temporal proximity between Plaintiff's protected disclosures and his termination demonstrates that the termination was retaliatory.

## FIRST CAUSE OF ACTION
*Whistleblower Retaliation*
(Cal. Lab. Code § 1102.5)

80. Plaintiff realleges all of the allegations contained in this complaint and incorporates

them by reference into this cause of action as though fully set forth herein.

81. At all times material to this Complaint, California Labor Code § 1102.5 was in effect and binding on Defendant. This section requires Defendant to refrain from retaliating against an employee for reporting a violation of, or for refusing to participate in, an activity that he reasonably believes would result in a violation of state or federal statute, or noncompliance with a state or federal rule or regulation.

82. Plaintiff disclosed to Adcock and Edelberg, persons with authority over him, information that he had reasonable cause to believe evidenced violations of state and federal safety laws, including OSHA regulations.

83. Plaintiff had reasonable cause to believe that Figure's conduct violated OSHA and California workplace safety statutes.

84. As a direct result of these protected disclosures, Figure retaliated by terminating Plaintiff's employment.

85. As a direct, foreseeable, and proximate result of Defendant's wrongful actions, Plaintiff has suffered and continues to suffer economic damages that include, without limitation, loss of wages, salary, benefits and/or additional amounts of money he would have received but for Defendant's actions as alleged herein, in amounts subject to proof.

**SECOND CAUSE OF ACTION**
*Whistleblower Retaliation*
(Cal. Lab. Code § 98.6)

86. Plaintiff realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein.

87. Labor Code § 98.6 prohibits an employer from discriminating or retaliating against an employee for filing a complaint or disclosing information about a safety violation or making a complaint regarding any violation of the California Labor Code.

88. Plaintiff engaged in a protected activity by opposing unsafe conditions and violations of law.

89. Plaintiff was terminated within ninety (90) days of engaging in such activity, triggering the rebuttable presumption of retaliation under SB 497.

COMPLAINT 11

90. As a direct, foreseeable, and proximate result of Defendant's wrongful actions, Plaintiff has suffered and continues to suffer economic damages that include, without limitation, loss of wages, salary, benefits and/or additional amounts of money he would have received but for Defendant's actions as alleged herein, in amounts subject to proof.

**THIRD CAUSE OF ACTION**
*Wrongful Termination
in Violation of Public Policy*

91. Plaintiff realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein.

92. Pursuant to Labor Code § 1102.5, California has a fundamental and substantive public policy that prohibits employers from retaliating against employees who engage in protected "whistleblowing" activities when the employee has reasonable cause to believe that the information discloses a violation of state or federal statute.

93. Labor Code § 98.6 also prohibits an employer from discriminating or retaliating against an employee for filing a complaint, disclosing information about a safety violation, or making a complaint regarding any violation of the California Labor Code.

94. Defendant was aware that Plaintiff had raised workplace-safety concerns, as Plaintiff communicated them directly to Figure's CEO and Chief Engineer.

95. After Plaintiff engaged in this protected conduct, Defendant retaliated against Plaintiff by engaging in the adverse employment action of termination.

96. Plaintiff's protected workplace-safety complaints were a substantial motivating reason for the adverse action.

97. Defendant's conduct described above violates the fundamental public policies of the State of California favoring workplace safety, employee whistleblowing, and compliance with statutory safety standards.

98. Plaintiff's termination in retaliation for protected activity constitutes wrongful termination in violation of public policy.

99. As a direct and proximate result of the wrongful acts of Defendant, Plaintiff has been harmed in that Plaintiff has suffered actual, consequential and incidental financial losses, including

without limitation loss of salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a. For all actual, consequential, and incidental financial losses according to proof;

b. For compensatory and general damages in an amount according to proof;

c. For penalties pursuant to Labor Code §§ 1102.5, 98.6;

d. Punitive damages for willful and malicious retaliation;

e. Attorneys' fees and costs under applicable law;

f. Pre- and post-judgment interest; and

g. Such additional and further relief as this forum may deem just and proper.

Dated: November 21, 2025                    Respectfully submitted,

**THE OTTINGER FIRM, P.C.**

/s/Melanie L. Proctor
Robert Ottinger
Melanie L. Proctor
*Attorneys for Plaintiff*