**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Viola Trebicka (Bar No. 269526)
violatrebicka@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Sara Pollock (Bar No. 281076)
sarapollock@quinnemanuel.com
William Pilon (Bar No. 326487)
williampilon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Teodora Pasca (Bar No. 6246037)
teodorapasca@quinnemanuel.com
295 Fifth Avenue, 9th Floor
New York, New York 10016-7103
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Attorneys for Defendant and Counter-Claimant
Figure AI Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT GRUENDEL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>FIGURE AI INC., a Delaware Corporation,<br><br>Defendant.<br><br>FIGURE AI INC., a Delaware Corporation,<br><br>Counter-Claimant,<br><br>v.<br><br>ROBERT GRUENDEL, an individual,<br><br>Counter-Defendant. | Case No. 5:25-cv-10094-EJD<br><br>**DEFENDANT/COUNTER-CLAIMANT FIGURE AI'S COUNTERCLAIMS**<br><br>Judge: Hon. Edward J. Davila |

**INTRODUCTION**

1. This case concerns a disgruntled former employee who, after being lawfully terminated for poor performance, has attempted to recast his termination as retaliation. Figure AI Inc. ("Figure") is an AI robotics startup focused on bringing a general-purpose humanoid robot to the market. Figure is committed to ensuring that its robots are meaningfully safe to operate in their intended use cases.

2. Safety has always been a top priority at Figure. Figure approaches safety holistically, thinking critically about how existing rules and standards constructed for industrial machinery may translate to the emerging humanoid robotics industry—a field that does not yet have tailored, unified safety standards. Figure has taken extensive measures not only to ensure that its own product is safe, but to promote safety across the entire emergent field. It has been particularly crucial to maintain the safety of Figure's robots in light of the company's more recent focus on deployment in the home, an environment associated with unique safety challenges.

3. As part of its safety mission, Figure hired Robert Gruendel ("Gruendel") as Principal Robotic Safety Engineer. But Gruendel failed at his job. Figure hired Gruendel to help the company build a safe robot, but Gruendel repeatedly misapplied irrelevant regulatory requirements to the company's novel products, insisted on pursuing initiatives ill-suited to Figure's needs, and misinterpreted professional disagreements about engineering approaches as indifference to safety itself. Gruendel's fixation on inapplicable compliance frameworks, inability to develop practical safety solutions for this new field, and failure to deliver on assignments created workflow roadblocks, wasted company resources, and threatened client relationships—ultimately causing Figure's leadership to lose confidence in his ability to perform his responsibilities. Instead of assisting the company in fulfilling its safety mission, Gruendel's tenure at Figure was marked by a fundamental inability to distinguish between safety engineering and compliance theater. The company terminated him after it concluded that he was wholly incapable of fulfilling the role for which he was hired: helping the company build a safe robot.

4. Worse, Figure has discovered that Gruendel engaged in unauthorized and unlawful conduct that underscores his vindictiveness and that violated both his employment contract and the

1  law. Gruendel secretly and indiscriminately copied vast numbers of Figure Slack messages, emails, and OneNote files to his personal accounts, in violation of company policy. He kept these stolen documents following his termination and continued to access them—and then attempted to cover his tracks through deletions and system cleaners. The Figure proprietary, confidential, and trade secret information Gruendel misappropriated includes operational and performance data, roadmaps, confidential RFPs, and board of directors presentations—and represents millions of dollars and years of investment by Figure. Figure hereby brings these counterclaims to protect its confidential business information from further disclosure or misuse and to vindicate its rights under federal and state law.

**THE PARTIES**

5.  Defendant and Counter-Claimant Figure AI Inc. is a non-public Delaware corporation with its principal place of business in California. Figure designs, develops, and manufactures advanced humanoid robots for commercial and consumer applications. Figure is at the forefront of the robotics industry and has invested substantial resources in developing proprietary technology, safety protocols, and strategic business plans.

6.  Plaintiff and Counter-Defendant Robert Gruendel is an individual who resides in the State of Washington. Gruendel was employed by Figure as Principal Robotic Safety Engineer from October 7, 2024 until his termination on September 2, 2025.

**JURISDICTION AND VENUE**

7.  This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1331 because the First Counterclaim arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., a federal statute. The Court has supplemental jurisdiction over the remaining counterclaims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

8.  This Court also has subject matter jurisdiction over these counterclaims under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Figure is a Delaware corporation with its principal place of business in California. Gruendel is a citizen of Washington.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these counterclaims occurred in this judicial district.

## BACKGROUND

**A.    Figure's Leadership in the Humanoid Robotics Industry**

10. Figure is a startup focused on the intersection of two exciting new technological frontiers: artificial intelligence and robotics. Founded with the bold vision to create humanoid robots that serve as the universal interface in the physical world, Figure seeks to build a future where people experience and interact with humanoid robots in their daily lives, both in the workforce and at home.

11. The humanoid robotics industry represents one of the most significant technological frontiers of the 21st century. Unlike traditional industrial robots, which are typically stationary and operate in controlled environments, humanoid robots must autonomously navigate complex, unstructured spaces while interacting safely with untrained personnel. This requires breakthrough advances in artificial intelligence, mechanical engineering, sensor technology, and safety systems.

12. Figure has invested hundreds of millions of dollars in research and product development to find innovative solutions to these challenges.

13. Figure's rapid progress has attracted investment from the world's leading technology companies. In early 2024, Figure announced a $675 million Series B financing round led by OpenAI and Microsoft, among other prominent investors. This investment validated Figure's technology and accelerated the company's commercialization efforts and AI development. In late 2025, Figure exceeded $1 billion in committed capital in its Series C funding round.

14. Figure's robots represent the cutting-edge integration between artificial intelligence and sophisticated mechanical systems, positioning the company as a leader in the race to bring commercially viable humanoid robots to market.

15. Figure's business strategy includes both industrial and consumer applications. The company has announced plans with high-profile commercial customers to deploy humanoid robots in manufacturing. More recently, Figure has dedicated efforts to developing robots for use in the home, where they will assist with daily tasks.

16. Figure's eventual commercial success in bringing humanoid robots into homes depends not only on technological sophistication, but also rigorous attention to safety—ensuring that robots can interact with untrained users, while guarding against associated risks.

17. To address the unique safety challenges posed by humanoid robots, Figure has invested heavily in safety research and development. Humanoid robots present safety risks distinct from traditional industrial robots due to their actively stable (rather than naturally stable) design. Humanoid robots must maintain their balance on two legs, navigate stairs and varied terrain, and interact in proximity with humans.

18. Recognizing these challenges and while still in the research and development phase itself, Figure has taken extensive measures to ensure that its robots are safe to use and interact with. Figure's commitment to safety also extends to its workplace and employees. For example, Figure has implemented comprehensive safety training for employees who work with robots and developing protocols to protect workers from potential hazards. These measures demonstrate that Figure takes seriously its obligations to maintain a safe workplace.

### B. Gruendel's Employment and Contractual Obligations

19. Building a safe robot is of paramount importance to Figure. Accordingly, in late 2024, Figure sought to hire a Principal Robotic Safety Engineer to help Figure develop and implement safety measures that ensured its product was safe across all of its iterations and for its intended use cases, including for deployment in both the workplace and the home.

20. On or about September 11, 2024, Gruendel accepted employment with Figure as Principal Robotic Safety Engineer. His first day at the company was October 7, 2024.

21. When accepting his employment, Gruendel signed an Offer Letter which included a $90,000 signing bonus and expressly provided that if Gruendel resigned or if Figure terminated his employment prior to the 12-month anniversary of his start date, he would be required to repay the company the full amount of the bonus within 30 days of termination.

22. As a condition of his employment, Gruendel also signed Figure's Employee Proprietary Information and Inventions Assignment Agreement ("PIIAA") on or about September 11, 2024. In doing so, Gruendel acknowledged that he would receive access to Figure's confidential

and proprietary information, including trade secrets, and became contractually obligated to treat that information with the care and confidentiality it required pursuant to the terms set out in the PIIAA.

23. The PIIAA defines "Proprietary Information" to include: (a) unpublished patent disclosures, patent applications, and other filings; (b) specifications, protocols, models, designs, equipment, engineering, algorithms, software programs, and software source documents; (c) information concerning or resulting from research, development, experimental work, clinical studies, and product development plans; and (d) business and financial information, including purchasing, procurement, manufacturing, customer lists, information relating to investors, employees, business and contractual relationships, business forecasts, sales and merchandising, and business plans.

24. Under Section 2 of the PIIAA, Gruendel expressly agreed: (a) not to use Proprietary Information except in the performance of his authorized duties as an employee of Figure; (b) not to disclose Proprietary Information to any third party, either during or after his employment, without prior written consent from Figure; and (c) to cease using and return to Figure all copies of Proprietary Information upon termination of his employment.

25. Section 4 of the PIIAA further provided that all notes, memoranda, reports, drawings, blueprints, manuals, materials, data, emails, and other papers and records of any kind, as well as other tangible or intangible materials that came into Gruendel's possession in the course of his employment, relating to any Proprietary Information, would be the sole and exclusive property of Figure, and that Gruendel agreed to surrender this property to Figure upon termination of employment.

C. **Figure's Proprietary Information and Trade Secrets**

26. Figure has invested tens of millions of dollars in research and development to create innovative humanoid robotics technology. Figure's proprietary information and trade secrets give it significant competitive advantages in the rapidly evolving robotics industry.

27. Figure's trade secrets include, but are not limited to: (a) technical specifications and design parameters for its humanoid robots, including the F.02 and F.03 models and their various components and operating environments; (b) proprietary safety testing methodologies, protocols,

and test results; (c) strategic roadmaps identifying planned features, target markets, and development timelines; (d) operational and performance data for its robots; (e) confidential business negotiations and partnerships; and (f) internal communications regarding product development priorities and strategic business decisions.

28. Figure takes extensive measures to protect the confidentiality of its trade secrets, including: requiring all employees to sign comprehensive confidentiality agreements; restricting access on a need-to-know basis; storing documents on secure, password-protected systems with access controls; clearly marking documents with confidentiality designations; and maintaining physical and electronic security measures to prevent unauthorized access.

29. Figure's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

### D.     Gruendel's Poor Performance and Resulting Termination

30. As set forth above, Figure hired Gruendel to assist the company in building a comprehensive product safety program appropriate for a cutting-edge robotics company developing humanoid robots for commercial deployment.

31. Figure tasked Gruendel with thinking outside the box and assisting the company with developing effective solutions to novel safety challenges in the emerging humanoid space.

32. Unfortunately, Gruendel proved to be a poor fit for this mission. Gruendel's experience with industrial robots did not translate to Figure's humanoid robots developed for home and domestic applications. Gruendel was never able to develop an adequate grasp of Figure's technology. Seeking to mask these deficiencies, Gruendel fixated on process, for example, attempting to steer resources toward obtaining existing certifications (regardless of their applicability) instead of recognizing that he needed to help Figure learn how to ensure humanoid robots were actually safe.

33. Throughout his tenure, Gruendel's approach to safety created obstacles rather than solutions. Rather than working collaboratively with Figure's engineering team to develop pragmatic safety solutions and protocols appropriate for the company's innovative technology, Gruendel

insisted on a rigid, "check the box" approach that failed to actually improve safety and was misaligned with Figure's needs and technological sophistication. In some cases, Gruendel's approach, if implemented, would have led to Figure's robot being more dangerous in its intended applications.

34. Over the course of several months, Figure's leadership lost confidence in Gruendel's ability to build an effective safety program. Despite receiving consistent feedback and generous opportunities to improve, Gruendel ultimately did not demonstrate the judgment, initiative, or competence necessary for his position.

35. When Gruendel proved unable to move beyond a check-the-box approach to safety—an approach ill-suited to the unique challenges posed by humanoid robots —Figure was eventually faced with no choice but to terminate him, which it did on September 2, 2025.

**E.  Gruendel's Misappropriation of Figure's Confidential and Proprietary Information**

36. During his employment, Figure entrusted Gruendel with access to the company's most sensitive and valuable proprietary information, including technical and design specifications, operational and performance data, safety protocols and test data, and confidential business proposals. Figure needed Gruendel to have access to this information so that he could anticipate potential risks and how to mitigate them.

37. But unbeknownst to Figure, Gruendel abused his access to collect and exfiltrate Figure's confidential and proprietary information for his own personal use.

38. In contravention of company policy, Gruendel synced his personal Google account to his Figure-issued laptop. This allowed Gruendel to transfer Figure documents to his Google account directly from his laptop.

39. Also in violation of company policy, Gruendel systematically created backups of his Figure Slacks, emails, and OneNote files, and stored them on his personal Google account. As a result, Gruendel kept a vast and indiscriminate amount of confidential Figure data outside of Figure's firewalls and other safety measures.

40.     Upon his termination, Gruendel was required to immediately return his Figure-issued laptop and all of Figure's confidential and proprietary information. He did not. Instead, Gruendel kept the Figure data he had stored on his personal Google account. He also kept the laptop and used it to try to cover his tracks, so that Figure would not discover the information he had misappropriated. Gruendel's futile attempts to cover his tracks included the following:

    a.     Gruendel removed his personal Google account from his work laptop on September 2, 2025, the day he was terminated. The removal of his personal account from his work laptop hid from Figure the data that remains in his personal account—including the Figure emails, Slacks, and Google Drive documents he downloaded.

    b.     On September 4, 2025, two days after his termination, Gruendel ran a program called CCleaner on his Figure laptop. CCleaner is a system cleaner used to delete files and remove all traces of the deletion. Gruendel's use of CCleaner removed many system artifacts from his Figure laptop, making it more difficult to track his activity.

    c.     On September 8, 2025, Gruendel emptied his deleted items folder in Outlook, ensuring that all recently deleted emails would not be recoverable or visible from the laptop.

41.     Figure cut off Gruendel's access to Figure's internal documents upon his termination. However, some Figure documents remained cached on Gruendel's Figure-issued laptop. Gruendel continued to access and use many of these documents—which he no longer has any right or legitimate need to access—in violation of the PIIAA.

42.     Gruendel also kept the Figure Slacks, emails, and OneNote files he had surreptitiously copied and stored on his personal Google account. This means that Gruendel retains proprietary and confidential information that he sent or received by Slack and email, or stored in OneNote, during the time he worked at Figure. For example, Gruendel retained:

    a.     A confidential RFP containing specifications and requirements for Figure's batteries, which reflect proprietary technical information and features unique to Figure's product;

b.  A Board of Directors presentation containing metrics tracking Figure robots' technical performance and failure rates, including reported placement accuracy, falls, and interventions, which reflect confidential information related to internal testing, including company methodology and metrics used for fault analysis, and all of which if disclosed could compromise Figure's competitive advantage in the robotics industry;

c.  An internal technical analysis of component failures;

d.  An internal analysis of the robot's operating environment, including lighting, temperature, humidity, terrain surface, altitude, electromagnetic emissions immunity, and light interference immunity specs along with required robot presence sensing capabilities and expectations for operator stop functionality;

e.  Documents containing performance data from Figure's industrial robots installed with a major customer; and

f.  Documents containing confidential legal advice and work product to which Figure holds the privilege.

43.  In December 2025, Gruendel began working for an entity he refers to anonymously as a "Stealth Startup," under the title of "Principal Safety Engineer." His job duties, as listed on his LinkedIn, include serving as the "single threaded leader for machinery safety and regulatory compliance at a leading US developer," "lead[ing] cross-functional teams to develop safety-critical features and complete certifications," and serving as a "[s]pecial expert on multiple American and International robot, functional safety, and electrical committees." Given the nature and scope of the confidential information Gruendel retained following his termination from Figure and the fact that Gruendel has kept the identity of this new employer secret, there is a substantial risk Gruendel has or will use Figure's confidential information while serving in his present role.

F.  **Gruendel's Breaches of Contract**

44.  Despite receiving both installments of his $90,000 signing bonus (the first installment on or about January 5, 2025, and the second installment on or about April 5, 2025),

Gruendel was terminated on September 2, 2025 and did not remain employed through the 12-month anniversary of his October 7, 2024 start date.

45. The Offer Letter expressly requires Gruendel to repay the full $90,000 signing bonus to Figure within 30 days of his September 2, 2025 termination date. The repayment deadline was October 2, 2025.

46. Gruendel failed to repay any portion of the $90,000 signing bonus to Figure, despite his clear contractual obligation to do so.

47. When he signed the PIIAA, Gruendel expressly agreed to cease using and return to Figure all copies and derivatives of Proprietary Information upon termination of employment.

48. Gruendel violated this obligation by: (a) accessing Figure's confidential information and trade secrets after his termination; (b) failing to return all copies of Figure's proprietary information in his possession; (c) using professional forensic software and external storage devices to collect and retain Figure's proprietary information; and (d) organizing Figure's confidential information into personal folders and directories for his own use.

49. Gruendel also violated his PIIAA obligations by failing to notify Figure of possible unauthorized use or disclosure of Proprietary Information and by failing to cooperate with Figure to enforce its rights in such information. Instead, Gruendel has actively opposed Figure's efforts to protect its trade secrets.

50. Gruendel's breaches of the Offer Letter and PIIAA have caused Figure substantial damages, including the value of the trade secrets misappropriated, the costs of investigating and responding to Gruendel's misconduct, the diminution in value of Figure's proprietary information resulting from Gruendel's unauthorized retention and potential disclosure, and the $90,000 signing bonus that remains unpaid.

## FIGURE'S COUNTERCLAIMS

### FIRST COUNTERCLAIM

**Trade Secret Misappropriation – Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.**

51. Figure repeats and realleges each and every allegation contained in paragraphs 1 through 50 hereof, with the same force and effect as if fully set forth herein.

52. Figure is the owner of valuable trade secrets, as defined by 18 U.S.C. § 1839(3), including technical and design specifications, operational and performance data, safety protocols and test data, and confidential business proposals.

53. Figure's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Figure's trade secrets give it a competitive advantage in a rapidly evolving industry.

54. Figure has taken reasonable measures to keep such information secret, including requiring confidentiality agreements, implementing access controls, marking documents as confidential, and maintaining physical and electronic security measures.

55. Figure's trade secrets relate to products and services used in, or intended for use in, interstate and foreign commerce, including humanoid robots designed for commercial and consumer applications.

56. Gruendel misappropriated Figure's trade secrets by: (a) acquiring Figure's trade secrets through improper means, including retaining possession of Figure's trade secrets without authorization after his employment terminated; (b) breaching his duty to maintain the secrecy of Figure's proprietary information; and (c) disclosing and/or using Figure's trade secrets without consent, knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy.

57. Gruendel's misappropriation was willful and malicious. Gruendel knew he had no authority to access or retain Figure's confidential information after his termination. Despite this knowledge, Gruendel deliberately kept and accessed Figure's trade secrets, and kept his Figure-issued laptop and deleted data to try to cover his tracks, all in flagrant disregard of his contractual obligations and Figure's rights.

58. Gruendel's misappropriation has caused and continues to cause Figure substantial actual loss and unjust enrichment. Figure has been damaged in an amount to be determined at trial but believed to exceed $75,000, including the loss of competitive advantages, the costs of forensic

investigation and litigation, and the potential for unauthorized disclosure or use of Figure's trade secrets.

59. Figure is entitled to recover its damages under 18 U.S.C. § 1836(b)(3)(B), including actual loss and any unjust enrichment by Gruendel not accounted for in the actual loss calculation, or alternatively, a reasonable royalty for Gruendel's unauthorized disclosure or use of Figure's trade secrets.

60. Because Gruendel's misappropriation was willful and malicious, Figure is entitled to exemplary damages in an amount up to two times the amount of damages awarded pursuant to 18 U.S.C. § 1836(b)(3)(C).

61. Figure is entitled to reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because Gruendel willfully and maliciously misappropriated Figure's trade secrets.

62. Unless enjoined by this Court, Gruendel will continue to use and disclose Figure's trade secrets, causing Figure irreparable injury for which there is no adequate remedy at law. Figure is therefore entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent actual or threatened misappropriation of its trade secrets and to require Gruendel to return all copies of Figure's proprietary information in his possession, custody, or control.

## SECOND COUNTERCLAIM

**Violation of California Comprehensive Data Access and Fraud Act – Cal. Penal Code § 502**

63. Figure repeats and realleges each and every allegation contained in paragraphs 1 through 62 hereof, with the same force and effect as if fully set forth herein.

64. Figure's computer systems, including its Google docs, servers, databases, and network infrastructure, constitute a "computer," "computer system," "computer network," and "data" as those terms are defined in California Penal Code § 502(b).

65. Gruendel knowingly accessed and without permission used Figure's computer systems and data in violation of California Penal Code § 502(c)(1), (2), (3), and (7).

66. Specifically, Gruendel violated California Penal Code § 502(c)(1) by knowingly accessing and without permission taking, copying, and making use of data from Figure's computer systems, including confidential documents, strategic business plans, technical specifications, and

other proprietary information, with the intent to defraud Figure and wrongfully control Figure's data and information.

67. Gruendel violated California Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, and making use of data from Figure's computer systems.

68. Gruendel violated California Penal Code § 502(c)(3) by knowingly and without permission using Figure's computer services, including but not limited to computer time, data processing or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network.

69. Gruendel violated California Penal Code § 502(c)(7) by knowingly and without permission accessing or causing to be accessed Figure's computers, computer systems, and computer network.

70. Gruendel's actions altered Figure's computer systems by installing software for creating backups, deleting data, and forensic imaging on Figure's laptop, and potentially altering access logs and metadata.

71. Gruendel's conduct was knowing, willful, and intentional. Gruendel engaged in systematic, premeditated access to Figure's systems over multiple days, used professional tools designed for data acquisition and deletion, and connected external storage devices to facilitate exfiltration.

72. As a direct and proximate result of Gruendel's violations of California Penal Code § 502, Figure has suffered and continues to suffer damages, including: (a) loss or impairment of data, particularly the value of trade secrets that Gruendel has misappropriated; (b) expenditure of resources and funds to investigate Gruendel's unauthorized access, conduct forensic analysis, and respond to the security breach; (c) loss of business advantages resulting from Gruendel's possession of confidential strategic plans and technical specifications; and (d) costs associated with this litigation to recover Figure's property and prevent further misuse of its confidential information.

73. Pursuant to California Penal Code § 502(e), Figure is entitled to recover compensatory damages, including damages for economic loss suffered because of Gruendel's violations.

74. Pursuant to California Penal Code § 502(e)(1) and (2), Figure is entitled to reasonable attorneys' fees and costs incurred in bringing this action.

75. Unless enjoined by this Court, Gruendel will continue to access, use, and disclose the data he has wrongfully obtained from Figure's computer systems, causing Figure irreparable injury for which there is no adequate remedy at law. Figure is therefore entitled to preliminary and permanent injunctive relief pursuant to California Penal Code § 502(e)(1) to prevent further violations and to require Gruendel to return all data and information obtained through his unauthorized access.

**THIRD COUNTERCLAIM**

**Breach of Employee Proprietary Information and Inventions Assignment Agreement**

76. Figure repeats and realleges each and every allegation contained in paragraphs 1 through 75 hereof, with the same force and effect as if fully set forth herein.

77. Figure and Gruendel entered into a valid and enforceable contract when Gruendel signed the Employee Proprietary Information and Inventions Assignment Agreement on or about September 11, 2024.

78. Under Section 2 of the PIIAA, Gruendel expressly agreed: (a) "I agree not to use the Proprietary Information except in the performance of my authorized duties as an employee of the Company"; (b) "I agree ... not to disclose all or any part of the Proprietary Information in any form to any third party, either during or after the term of my employment, without the prior written consent of the Company"; and (c) "Upon termination of my employment, I agree to cease using and to return to the Company all whole and partial copies and derivatives of the Proprietary Information, whether in my possession or under my direct or indirect control."

79. Under Section 4 of the PIIAA, Gruendel agreed to the following: "[A]ll notes, memoranda, reports, drawings, blueprints, manuals, materials, data, emails and other papers and records of every kind, or other tangible or intangible materials which shall come into my possession in the course of my employment with the Company, relating to any Proprietary Information, shall be the sole and exclusive property of the Company and I hereby assign any rights or interests I may

obtain in any of the foregoing to my employer. I agree to surrender this property to my employer upon termination of my employment, or at any time upon request by my employer."

80. Figure fully performed its obligations under the PIIAA by providing Gruendel with employment, compensation, and access to Proprietary Information necessary to perform his job duties.

81. Gruendel materially breached the PIIAA in multiple ways, including: (a) using Figure's Proprietary Information after his termination and outside the scope of his authorized duties as an employee; (b) failing to cease using Figure's Proprietary Information upon termination; (c) failing to return all copies and derivatives of Figure's Proprietary Information upon termination; (d) retaining possession of Figure's Proprietary Information without authorization through storage on external hard drives, personal computers, or other devices; and (e) failing to surrender property containing Figure's Proprietary Information upon request.

82. Specifically, Gruendel breached Section 2 of the PIIAA by: (a) accessing and using Figure's Proprietary Information after his September 2, 2025 termination; (b) collecting, copying, and organizing Figure's Proprietary Information in personal folders and directories for his own use rather than in the performance of authorized duties as an employee; (c) retaining copies of Figure's Proprietary Information rather than returning all copies upon termination; and (d) disclosing Figure's Proprietary Information to third parties.

83. Gruendel breached Section 4 of the PIIAA by: (a) failing to surrender computer files, documents, and other compilations containing Figure's Proprietary Information upon termination; (b) creating personal copies of Figure documents, files, and compilations for his own use rather than treating them as the sole and exclusive property of Figure; and (c) retaining possession and control of Figure property containing Proprietary Information despite having no right to do so after termination.

84. The PIIAA further provided: "I shall promptly notify my supervisor or any officer of the Company if I learn of any possible unauthorized use or disclosure of Proprietary Information and shall cooperate fully with the Company to enforce its rights in such information." Gruendel violated this obligation by failing to notify Figure of his own unauthorized use and retention of

Proprietary Information and by failing to cooperate with Figure's efforts to protect its proprietary rights.

85. As a direct and proximate result of Gruendel's breaches of the PIIAA, Figure has suffered substantial damages, including: (a) the loss of exclusive control over its Proprietary Information and trade secrets; (b) the diminution in value of its Proprietary Information resulting from Gruendel's unauthorized retention and potential disclosure; (c) the costs of investigating Gruendel's breaches, conducting forensic analysis, and pursuing legal remedies; (d) the loss of competitive advantages resulting from Gruendel's possession of confidential strategic plans and technical information; and (e) the risk of future disclosure or use of Figure's Proprietary Information in ways that will create irreparable harm and damage Figure's business interests.

86. Figure's damages are in an amount to be determined at trial but are believed to exceed $75,000.

87. Unless enjoined by this Court, Gruendel will continue to breach his obligations under the PIIAA by retaining, using, and potentially disclosing Figure's Proprietary Information, causing Figure irreparable injury for which there is no adequate remedy at law. Figure is therefore entitled to preliminary and permanent injunctive relief requiring Gruendel to comply with his contractual obligations, including returning all copies of Figure's Proprietary Information and ceasing all use and disclosure thereof.

### FOURTH COUNTERCLAIM

**Breach of Contract – Failure to Repay Signing Bonus**

88. Figure repeats and realleges each and every allegation contained in paragraphs 1 through 87 hereof, with the same force and effect as if fully set forth herein.

89. Figure and Gruendel entered a valid and enforceable contract when Gruendel signed the Offer Letter on or about September 11, 2024, and commenced employment on October 7, 2024.

90. The Offer Letter provided that Figure would pay Gruendel a signing bonus of $90,000, payable in two installments: "You will receive 50% of the Sign-On Bonus 90 days following your start date and the remaining 50% of the Sign-On Bonus 180 days following your start date."

91. The Offer Letter further expressly provided: "If you voluntarily resign or the Company terminates your employment prior to the 12-month anniversary of your Start Date, then you agree to repay the Company the amount of the Sign-On Bonus within 30 days of your date of termination."

92. Figure fully performed its obligations under the Offer Letter by: (a) employing Gruendel as Principal Robotic Safety Engineer from October 7, 2024 through September 2, 2025; (b) paying Gruendel the first installment of $45,000 of the signing bonus on or about January 5, 2025 (90 days after his start date); and (c) paying Gruendel the second installment of $45,000 of the signing bonus on or about April 5, 2025 (180 days after his start date).

93. Figure terminated Gruendel's employment on September 2, 2025, which was prior to the 12-month anniversary of Gruendel's October 7, 2024 start date.

94. Pursuant to the express terms of the Offer Letter, upon termination of his employment on September 2, 2025, Gruendel became obligated to repay the full $90,000 signing bonus to Figure within 30 days, i.e., by October 2, 2025.

95. Gruendel has breached the Offer Letter by failing and refusing to repay any portion of the $90,000 signing bonus to Figure, despite his clear contractual obligation to do so and despite the expiration of the 30-day repayment period.

96. As a direct and proximate result of Gruendel's breach of contract, Figure has sustained damage in the amount of $90,000, plus interest thereon at the legal rate from October 2, 2025.

97. Figure is entitled to recover the $90,000 signing bonus, together with pre-judgment and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Counter-Claimant Figure AI Inc. respectfully requests that this Court enter judgment in its favor and against Plaintiff Robert Gruendel as follows:

98. On the First Counterclaim for Misappropriation of Trade Secrets under the Defend Trade Secrets Act:

     a.     Awarding compensatory damages in an amount to be determined at trial, including Figure's actual loss and any unjust enrichment by Gruendel not accounted for in the actual loss calculation, or alternatively, a reasonable royalty for Gruendel's unauthorized disclosure or use of Figure's trade secrets;

     b.     Awarding exemplary damages in an amount up to two times the compensatory damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C), based on Gruendel's willful and malicious misappropriation;

     c.     Awarding Figure its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D);

     d.     Granting preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) prohibiting Gruendel from using or disclosing Figure's trade secrets and requiring Gruendel to return all copies of Figure's proprietary information in his possession, custody, or control;

99.     On the Second Counterclaim for Violation of the California Comprehensive Data Access and Fraud Act:

     a.     Awarding compensatory damages in an amount to be determined at trial, including damages for economic loss suffered because of Gruendel's violations of California Penal Code § 502;

     b.     Awarding Figure its reasonable attorneys' fees and costs pursuant to California Penal Code § 502(e)(1) and (2);

     c.     Granting preliminary and permanent injunctive relief pursuant to California Penal Code § 502(e)(1) prohibiting Gruendel from accessing Figure's computer systems and requiring return of all data obtained through unauthorized access;

100.     On the Third Counterclaim for Breach of the Employee Proprietary Information and Inventions Assignment Agreement:

     a.     Awarding compensatory damages in an amount to be determined at trial but believed to exceed $75,000;

b. Granting preliminary and permanent injunctive relief requiring Gruendel to comply with his contractual obligations under the PIIAA, including returning all copies of Figure's Proprietary Information and ceasing all use and disclosure thereof;

101. On the Fourth Counterclaim for Breach of Contract – Failure to Repay Signing Bonus:

a. Awarding damages in the amount of $90,000, representing Gruendel's contractual obligation to repay his full signing bonus;

b. Awarding pre-judgment interest at the legal rate from October 2, 2025;

102. Awarding Figure post-judgment interest at the legal rate;

103. Awarding Figure its costs of suit; and

104. Granting Figure such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Counter-Claimant Figure AI Inc. hereby demands a trial by jury on all issues so triable.

DATED: January 16, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By   */s/ Viola Trebicka*
Viola Trebicka
Attorney for Defendant and Counter-Claimant